**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., et al.,<br><br>      *Plaintiffs*,<br><br>    v.<br><br>SIDNEY POWELL, et al.,<br><br>      *Defendants*. | Civil Action No. 1:21-cv-00040 (CJN) |
| US DOMINION, INC., et al.,<br><br>      *Plaintiffs*,<br><br>    v.<br><br>RUDOLPH W. GIULIANI,<br><br>      *Defendant*. | Civil Action No. 1:21-cv-00213 (CJN) |
| US DOMINION, INC., et al.,<br><br>      *Plaintiffs*,<br><br>    v.<br><br>MY PILLOW, INC., et al.,<br><br>      *Defendants*. | Civil Action No. 1:21-cv-00445 (CJN) |

<u>**MEMORANDUM OPINION**</u>

US Dominion, Inc., and other related corporate entities sued three sets of Defendants—

Sidney Powell, her law firm, and a related entity; Rudy Giuliani; and Mike Lindell and his

1

company, My Pillow, Inc.—alleging that they each defamed Dominion in connection with the 2020 presidential election.  Although the three lawsuits have not been consolidated, they were designated as related pursuant to Local Rule 40.5(b)(2) and assigned to this Court.  The Defendants have since moved to dismiss all of Dominion's claims.  For the following reasons, the Court denies their Motions in full.

## I.      Factual Background

The most recent presidential election occurred on November 3, 2020.[1]  While many Americans cast their votes that day, others did not; some voted in-person before November 3, and others sent their ballots by mail.  States employed a myriad of procedures to handle early and mail-in votes:  some started counting in the days or weeks leading up to the election, while others waited until Election Day itself.  *See, e.g.*, 25 Pa. Stat. § 3146.8 (2020) (dictating that Pennsylvania mail-in ballots may be counted no earlier than seven o'clock a.m. on election day); N.C. Gen. Stat. § 163-234 (2020) (directing that North Carolina may start counting two weeks before election day).

Even twenty-four hours after the polls closed, no clear winner had emerged—several news outlets projected 253 electoral votes for now-President Biden and 213 for then-President Trump, but the outcome of the election depended on six states (Georgia, Pennsylvania, Nevada, North Carolina, Alaska, and Arizona) whose results were not finalized until much later.[2]

---

[1] The following factual summary is drawn from the facts alleged in the Complaint, documents attached as exhibits or incorporated by reference in the Complaint, and matters about which the Court may take judicial notice.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997).

[2] *See No winner yet, but Joe Biden's chances to be US president looks better*, Deccan Chronicle (Nov. 5, 2020), https://www.deccanchronicle.com/world/america/051120/no-winner-yet-but-bidens-chances-looks-better-with-253-electoral-col.html.

On November 7, various news outlets declared Joe Biden the winner.[3]   But public controversy surrounding the election was far from over:  election results in various states were challenged, audited, and eventually certified over the course of the next several weeks.

### A.  The Parties

US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (together, "Dominion") are related corporate entities involved in the sale of electronic voting machines and software in the United States.   Powell Compl., ECF No. 1 at ¶ 2 n.1.  Dominion contracts with state and local governments to supply voting systems and services in elections across the country.   *Id.* ¶ 33.  At the time of the 2020 presidential election, Dominion had contracts to supply those services in twenty-eight states and Puerto Rico.   *Id.*

These three corporate entities are now organized as US Dominion, Inc., a Delaware corporation based in Denver, Colorado, *id.* ¶ 30, and its two wholly-owned subsidiaries, Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation, *id.* ¶¶ 12–14, 32.   The companies' origins lie in the founding in 2002 of Dominion Voting Systems Corporation (also now a subsidiary) in Toronto, Ontario.   *Id.* ¶ 29.

Defendant Sidney Powell is an attorney, formal federal prosecutor, and media figure.   *Id.* ¶ 15.  She is a director of Defending the Republic, Inc. ("DTR"), a Texas corporation that runs the website defendingtherepublic.org, *id.* ¶¶ 17, 21, and the president of Powell, P.C., a Texas law firm and sole proprietorship from which she conducts her private practice, *id.* ¶ 16.  Among other recent representations, between 2018 and 2020, Powell and her law firm represented Michael

---

[3] *See, e.g.*, Gabriel T. Rubin, *Joe Biden Wins the 2020 Presidential Election:  What Happens Next?*, Wall St. J. (Nov. 7, 2020), https://www.wsj.com/articles/joe-biden-wins-the-2020-presidential-election-what-happens-next-11604772736; Katie Glueck, *Joe Biden is elected the 46th president of the United States.*, N.Y. Times (Nov. 7, 2020), https://www.nytimes.com/2020/11/07/us/politics/joe-biden-is-elected-the-46th-president-of-the-united-states.html.

Flynn in the criminal case against him in this district.  *Id.* ¶¶ 24, 25, 80.  Powell also appeared as counsel of record in election-related lawsuits in Georgia, Michigan, Wisconsin, and Arizona filed by various parties.  *Id.* ¶ 75.  During the period relevant to this suit, Powell made numerous media appearances in which she discussed the election and Dominion.

Defendant Rudolph Giuliani once served as the mayor of New York City, Associate Attorney General of the United States, and United States Attorney for the Southern District of New York.  Giuliani Compl., ECF No. 1 at ¶ 8.  He hosts a radio show and YouTube podcast and is the personal attorney for President Trump.  *Id.*  Giuliani has also represented the Trump campaign, including in its lawsuit challenging mail-in ballots and the conduct of election officials in Pennsylvania.  *Id.* ¶ 25.  Like Powell, Giuliani made numerous media appearances in which he discussed the election and Dominion.

Defendant Michael Lindell is the founder and CEO of My Pillow, Inc. ("MyPillow"), Lindell Compl., ECF No. 1 at ¶ 10, a Minnesota corporation that sells (among other things) pillows and bedding, *id.* ¶ 9.  In July 2017, then-President Trump endorsed MyPillow at a White House event.  *Id.* ¶ 22.  MyPillow sponsored several rallies in support of President Trump and has offered discounts on its products using discount codes such as "FightforTrump," "45," and "PROOF."  *Id.* ¶ 1.  Like Powell and Giuliani, Lindell has made numerous media appearances in which he discussed the election and Dominion.

Dominion alleges that each Defendant made defamatory statements about its role in the 2020 election.  Those statements are too numerous to summarize in their entirety; the Court limits its discussion to the allegations necessary to decide the pending Motions.

### B.  Examples of Allegedly Defamatory Statements

On the day of the presidential election, Powell appeared on One America News Network and declared that Democrats were trying to "steal the vote" from President Trump and that "they ha[d] developed a computer system to alter votes electronically."  Powell Compl. ¶ 52.  Shortly thereafter, she and Giuliani visited Trump campaign headquarters, where they both urged the campaign's attorneys to cast doubt on election results by focusing suspicion on Dominion.  *Id.* ¶ 54; Giuliani Compl. ¶ 15.  The campaign declined to pursue those claims after Powell was unable to provide it with supporting evidence.  Powell Compl. ¶ 55.

Between November 3 and December 23, both Powell and Giuliani appeared on various television shows in which they stated that Dominion was connected to Venezuela.  Powell Compl. ¶¶ 52, 181(ee).  In particular, on November 12, Giuliani appeared on Fox Business's *Lou Dobbs Tonight* and stated that Dominion is owned by a company called Smartmatic, which Giuliani claimed was formed "by three Venezuelans" "in order to fix elections."  Giuliani Compl. ¶ 178(b).  Powell was a guest on the show the next day; she stated that she could "hardly wait to put forth all the evidence we've collected on Dominion, starting with the fact it was created to produce altered voting results in Venezuela for Hugo Chávez and then shipped internationally to manipulate votes for purchase in other countries[,] including this one."  Powell Compl. ¶ 181(e).

On November 15, Powell appeared on Fox News's *Sunday Morning Futures*.  *Id.* ¶ 181(g).  She stated that Dominion was involved in "massive election fraud" and that she had "evidence . . . of substantial sums of money being given to family members of state officials who bought [Dominion] software."  *Id.*  Two days later, she appeared on Newsmax's *Greg Kelly Reports* and said that "[w]e've got the evidence from [the] mouth of the guy who founded the company.  I haven't had a chance to get that out to the public yet but . . . the founder of [Dominion] admits he

can change a million votes, no problem at all."  *Id.* ¶ 181(j).  Powell promised that she would

"tweet out the video later and . . . tag [the host] in it."  *Id.*  She has not disclosed the video.  *Id.*

¶ 60.

On November 19, Giuliani and Powell appeared together at a press conference at

Republican National Committee headquarters in Washington, D.C.  *Id.* ¶ 62.  At that press

conference, Giuliani stated that they "represent[ed] President Trump and . . . the Trump

campaign," *id.*,[4] and Powell repeated her claims about Dominion being a tool created "to make

sure [Hugo Chávez] never lost an election" and imported to the United States to flip votes from

Trump to Biden in the 2020 election.  *Id.* ¶ 63.  Powell stated that the legal team had collected

> testimony of different workers admitting that they were trained how to dispose of
> Trump votes and add to Biden votes.  The software has a feature pursuant to which
> you can drag and drop any number of batches of votes to the candidate of your
> choice or simply throw them away.  So, we have mathematical evidence in a
> number of states of massive quantities of Trump votes being trashed—just simply
> put in the trash like you would on your computer with any file and Biden votes
> being injected.

*Id.* ¶ 181(k).  President Trump later sent a tweet including video footage of this press conference.

*Id.* ¶ 66.

After a hand recount, Georgia certified its election results on November 20.  Powell Compl.

¶ 68.  That same day, Powell appeared on the *Examining Politics* podcast and stated that Dominion

"paid kickbacks and benefits to families of public officials who . . . got [Dominion its] government

contracts."  *Id.* ¶ 181(n).  One day later, she appeared on Newsmax and elaborated that Georgia

---

[4] On November 14, President Trump sent a tweet stating that "[Rudy] Giuliani [would be] spearheading the legal
effort to defend OUR RIGHT to FREE and FAIR ELECTIONS!"  Powell Compl. ¶ 59.  He also stated that Powell
had been added that legal team.  *Id.*  On November 22, the Trump campaign (through Defendant Giuliani), issued a
statement that "Powell is practicing law on her own.  She is not a member of the Trump Legal Team.  She is also not
a lawyer for the President in his personal capacity."  *Id.* ¶ 72.

state officials were "in on this Dominion scam with their last-minute purchase of a contract to Dominion of a hundred million dollars." *Id.* ¶ 69.

On November 23, Powell again claimed that Dominion had stolen Trump votes "by massive election fraud" and that she was collecting "overwhelming" "evidence" that Dominion "shift[ed] millions of votes from President Trump." *Id.* ¶ 73. She also served as counsel to plaintiffs in lawsuits in Georgia, Michigan, Wisconsin, and Arizona alleging, among other things, that there had been "massive election fraud" and that Dominion was "founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chávez never lost another election." *Id.* ¶¶ 75, 80.

Powell also made public statements that Dominion had flipped, weighted, and "injected" votes. On November 28, she stated on Newsmax that Dominion "weighted votes for President Trump at .77% and they awarded votes to Biden at something like 1.22% . . . . [Dominion] was designed to enable those sorts of vote flipping and switching and the ability to trash votes in large numbers so that Mr. Biden would win without campaigning." *Id.* ¶ 181(s). On December 2, she spoke at a "Stop the Steal" rally in Georgia, where she claimed that Georgia had performed a hand recount in only one "small precinct" (instead of the entire state) and that, in that county, "they flipped . . . 52% I think of the votes there . . . . [T]hey weighted Biden votes at 1.52 and they weighted Trump votes at .48 when the votes went into the machine to change them." *Id.* ¶ 181(u). The next day, she appeared on *The John Fredericks Show* (broadcast from Georgia) and stated that

> one of the things we know is, from prior use and testimony, that Dominion machines can flip 2.7%–3% of the vote from Trump to Biden easily. That's kind of what they've run many times before. And that stands to reason that that accounts for the 6% up for Biden where the Dominion machines were operating . . . . You don't just add 350,000 Biden votes all of a sudden at 3 o'clock in the morning. That's like flipping a coin 350,000 times and it always lands on heads. It doesn't

happen.  It's a mathematical and statistical impossibility . . . they can literally just
make up a number and inject it into the system.

*Id.* ¶ 181(v).

By December 9, all of the election-related lawsuits in which Powell served as counsel had

been dismissed.  *Id.* ¶ 79.  Following the dismissals, Powell appeared on the *Rush Limbaugh Show*

on December 29, and claimed that

> [t]he flipping of votes by Dominion is even advertised; their ability to do that
> fraction, to make a Biden vote count 1.26 and a Trump vote count only .74.  They've
> done it before.  They've done it in Venezuela.  They've done it in other foreign
> countries.  They've done it in this country.  We have evidence even that it was done
> in 2016 in California to benefit Hillary over Bernie, and it's been done in other
> local elections and smaller elections, different places . . . .  It's absolutely the most
> appalling criminal operation in the history of our country.

*Id.* ¶ 181(ii).

Also in early December, Lindell (like Powell and Giuliani) made various public statements

regarding the election and Dominion.  On December 3, he appeared on *America First* with

Sebastian Gorka and stated that he and Powell were "getting the word out on this election fraud"

and that they were trying to get these "Dominion machines."  Lindell Compl. ¶ 43.  He also told

viewers that the "President loves" MyPillow and that they could use promotional code "Gorka"

for a discount at MyPillow.com.  *Id.* ¶ 44.  In a December 11 interview with the Conservative

Business Journal, he explained that President Trump had received so many votes that he "broke

the algorithm" that had been programmed to give "1.3 to Biden and 0.7 to the [P]resident."  *Id.*

¶ 50.

On December 12, Lindell spoke at two MyPillow-sponsored rallies in the District of

Columbia.  At the "Women for America First" rally, he told the audience that

> [o]n election night, at 11:15 p.m., all the algorithms that were set across our country
> in the machines . . . where Biden got like 1.2 votes for every vote and our president

8

got .66. . . . 80 million votes that came in for our great President . . . broke the algorithms in the machines.

*Id.* ¶ 165(a).  At the Jericho March held on December 12 in Washington D.C., he said that

[e]verything that I've been telling you for three weeks now is true.  I have seen it.  The fraud is 100% and Donald Trump will be our president for four more years . . . .  They tried to steal this election . . . on election night at . . . 11:15, the algorithms of these machines that cheated the whole country could not keep up.  Because he had got so many votes that broke the algorithms . . . .  The technology of these Dominion machines . . . it's all going to be exposed in the future . . . .  Georgia, you better have a fair election and not use those machines.

*Id.* ¶ 165(b).  The Jericho March rally also displayed a MyPillow ad featuring Lindell and offering viewers a discount on MyPillow products if they used the promotional code "ERIC" (presumably as a reference to Eric Metaxas, another speaker at the march).  *Id.* ¶ 55.

Between December 16 and 23, Dominion sent retraction demand letters to Powell, Giuliani, Lindell, and a number of news outlets (including ones on which one or more of those Defendants had appeared).  Powell Compl. ¶ 145; Giuliani Compl. ¶ 138; Lindell Compl. ¶¶ 59–60.  On December 21 (after receiving a retraction letter), Newsmax aired a segment to "clarify its coverage" about Smartmatic and Dominion systems.  Lindell Compl. ¶ 60.  That same day, Lindell appeared on a Newsmax show and declared that "the biggest fraud is the Dominion machines" and referenced a "miracle . . . at 11:15 on election night."  *Id.* ¶ 165(g).  That evening, Lindell sent a tweet with a link to an article about Powell and stating, "We have all the evidence!!!  Biggest election fraud in world history!!!!  Crime against the world!!!"  *Id.* ¶ 62.  Appearing on *FlashPoint* on December 23, Lindell described Dominion's involvement in the election as "the biggest crime ever committed in the history against our country and the world."  *Id.* ¶ 165(h).  On January 18, 2021 (after receiving his own retraction letter from Dominion), Lindell stated that Dominion machines "were built to cheat" and "steal elections," *id.* ¶ 70, and he "welcome[d Dominion] to come after [him] because [he had] all the evidence and then they'll finally see it," *id.* ¶¶ 63, 160.

In the weeks following Dominion's retraction demands, Defendants continued to speak publicly about Dominion and the election.  On January 5, 2021, Lindell spoke at the Moms for America "Save the Republic" rally in the District of Columbia.  *Id.* ¶ 65.  He told the audience that "algorithms" in "Dominion machines" weighted Biden votes and that, "if the truth comes out," we could avoid a civil war.  *Id.*  Later that day, Giuliani sent a tweet with a link to his podcast in which he claimed that "Dominion machines . . . switched 6,000 votes."  Giuliani Compl. ¶ 147.  On January 6—in the hours leading up to the attack on the Capitol—Lindell and Giuliani made similar public statements to crowds gathered in the District.  Lindell spoke at the Women for America First's "March for Trump" bus tour (a tour sponsored by MyPillow) and stated that Dominion machines used an "algorithm" to steal votes from Trump, but—in an event he called the "election night miracle"—Trump had received so many votes that those algorithms had broken.  *Id.* ¶ 35.  Lindell declared that he had "been working with General Flynn, . . . Sidney Powell, [and] Rudy Giuliani . . .  [t]o look into the fraud. . . .  It's the biggest election corruption in the history [sic]."  Lindell Compl. Ex. 268, ECF No. 2-67 at 4.

> Giuliani, at the "Save America" protest in front of the White House, told crowds that
>
> we get to see the machines that are crooked, the ballots that are fraudulent. . . .  So, let's have trial by combat. . . .  [O]ne of the experts who's examined these crooked Dominion machines, has absolutely found what he believes is conclusive proof that in the last 10%, 15% of the vote counted, the votes were deliberately changed by the same algorithm that was used in cheating President Trump and Vice President Pence, same algorithm, same system, same thing was done with the same machines. . . .  This election was stolen.

Giuliani Compl. ¶ 152.

## C.  Defendants' Claims of Supporting Evidence

In addition to making the statements summarized above, Powell, Giuliani, and Lindell all stated that they had evidence to prove their claims.  For example, Powell has stated that she is in

possession of a video that depicts the founder of Dominion saying that "he can change a million votes, no problem at all." Powell Compl. ¶ 181(j). She has also pointed to documents filed in her election lawsuits, including an undated certificate from the Georgia Secretary of State, *id.* ¶ 91; declarations from an anonymous "military intelligence expert," *id.* ¶ 88, and "Venezuelan military officer," *id.* ¶ 90; research into general concerns about election security, *id.* ¶ 89; and expert reports (one of which Giuliani also touted in his podcast, Giuliani Compl. ¶¶ 58–59), Powell Compl. ¶ 82. Those court filings were also posted on DTR's website. *Id.* ¶¶ 17, 21.

On January 15, 2021, Lindell tweeted evidence in the form of a screenshot of an article from an online blog called *The American Report*. Lindell Compl. ¶ 75. Lindell claimed that the blog contained "pages of the machine voter fraud evidence that came out last week." *Id.* He also tweeted a screenshot to an *American Report* spreadsheet that he said was "one page of hundreds that prove President Trump got around 79m votes to 68m votes for Biden!" *Id.* On February 4, Lindell appeared on *FlashPoint* and claimed that he had "a cyber footprint from inside the [Dominion] machines" proving that the machines were hacked "by foreign countries, starting with China." *Id.* ¶ 165(x).

Lindell later included this same material in a two-hour documentary called "ABSOLUTE PROOF." (Lindell was an executive producer of the film.) *Id.* ¶¶ 103, 126, 127. The video also suggested that then-Attorney General Bill Barr (who had stated that the Department of Justice had not seen evidence of widespread election fraud) was "corrupt" and had been "compromised." *Id.* ¶ 114. Beginning on February 5, "ABSOLUTE PROOF" was broadcast on multiple news outlets and posted online. *Id.* ¶ 104. Lindell's website (michaeljlindell.com) also posted the video; beneath it, a MyPillow ad encouraged viewers to use the promotional code "PROOF" to receive forty percent off a MyPillow product. *Id.*

11

## II.      Procedural Background

On January 8, Dominion filed a lawsuit against Powell, her law firm, and DTR (collectively, "Powell" or "the Powell Defendants") for defamation and deceptive trade practices under Georgia law.  *See generally* Powell Compl.  A month later, Dominion filed a similar suit against Lindell and MyPillow, alleging defamation and deceptive trade practices under Minnesota law.  *See generally* Lindell Compl.  It also separately sued Giuliani on a single count of defamation.  *See generally* Giuliani Compl.  In all three lawsuits, Dominion alleges that the Defendants' conduct caused (1) Dominion employees to be "stalked, . . . harassed, and . . . receive[] death threats," requiring Dominion to expend money "to remedy the defamation and to protect the lives of its employees," and (2) harm in the form of lost profits and damage to its name, reputation, and goodwill.  *See* Powell Compl. ¶ 145; Giuliani Compl. ¶ 175; Lindell Compl. ¶ 171.  Dominion alleges that it has suffered at least $651,735,000 in damages.[5]  *See generally* Powell Compl.; Giuliani Compl.; Lindell Compl.  The cases were designated as related pursuant to Local Rule 40.5(b)(2).

All Defendants move to dismiss, but make different arguments.  The Powell Defendants argue that this Court cannot exercise personal jurisdiction over them; that the claims against them should be transferred to Texas; and that Dominion has failed to state its defamation claim because Powell's statements are only statements of opinion, not fact, and Dominion has failed to plead actual malice.  *See generally* Powell's Mem. Supp. Defs.' Mot. to Dismiss ("Powell's Mot."), ECF

---

[5] Dominion also seeks $651,735,000 in punitive damages, costs and fees, and—with respect to the Powell and Lindell Complaints—a "narrowly tailored permanent injunction requiring the removal of all [their] statements that are determined to be false and defamatory and enjoining [them] from repeating in such statements or engaging in any further deceptive trade practices relating to Dominion."  *See* Powell Compl. ¶ 196(d); Giuliani Compl.; Lindell Compl. ¶ 178(d).

No. 22-2.  The Powell Defendants also seek dismissal of Dominion's deceptive trade practices claim on the ground that they were not "engaged in trade and commerce of goods."

Lindell and MyPillow filed separate Motions.  Lindell argues that he is not subject to the Court's personal jurisdiction; that venue is improper; and that Dominion has failed to state a defamation claim because his statements are protected as "debate on public issues" and because Dominion has failed to plead actual malice.  Lindell's Mem. Supp. Defs.' Mot. to Dismiss ("Lindell's Mot."), ECF No. 34-1.  MyPillow joins those arguments but also contends that the claims against it must be dismissed because it hasn't made any statements about Dominion.  MyPillow's Mem. Supp. Defs.' Mot. to Dismiss ("MyPillow's Mot."), ECF No. 30-1.  Both Defendants also argue that Dominion's deceptive trade practices claim must be dismissed because it merely recasts its defamation claim.

Giuliani argues only that the defamation claim against him should be dismissed because Dominion may only recover lost profits as special damages, which he argues Dominion has failed to plead.  Giuliani's Mem. Supp. Defs.' Mot. to Dismiss ("Giuliani's Mot."), ECF No. 26-2.

On June 24, 2021, the Court heard oral argument on Defendants' Motions.

### III.    Legal Standard

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (internal quotation omitted).  Although the Court accepts all well-pleaded facts in the complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation

to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotations and citations omitted).  The claim to relief must be "plausible on its face," and a plaintiff's pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

Several of the Defendants also move to dismiss for lack of personal jurisdiction.  When deciding a motion to dismiss pursuant to Rule 12(b)(1), the Court may consider materials outside the pleadings "to assure itself of its own subject matter jurisdiction," *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)), and must construe the complaint liberally to afford all possible inferences favorable to the pleader on allegations of fact, *Settles*, 429 F.3d at 1106.  But the Court need not accept as true "a legal conclusion couched as a factual allegation," *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), or an inference "unsupported by the facts set out in the complaint," *Trudeau*, 456 F.3d at 193 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  In all events, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction by a preponderance of the evidence, *Conejo v. Am. Fed'n of Gov't Emps., AFL-CIO*, 377 F. Supp. 3d 16, 24 (D.D.C. 2019) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936)).

## IV.   Analysis

### A.  Statements of Fact or Opinion

Powell alone argues that her statements cannot be defamatory because no reasonable person could conclude that they were statements of fact.  According to Powell, her statements were either "opinions" that cannot be proven true or false or "legal theories . . . made in the context of pending and impending litigation."  Powell's Mot. at 43–44.

For a statement to be actionable as defamatory, it must at least express or imply a verifiably false fact about the plaintiff. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990). And while statements of opinion regarding matters of public concern cannot be defamatory if they do *not* contain or imply a provably false fact, they are actionable if they imply a provably false fact or rely upon stated facts that are provably false. *Id.* at 20. "In deciding whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact about [the plaintiff], the court must consider the statement in context." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001).[6]

Powell contends that no reasonable person could conclude that her statements were statements of fact because they "concern the 2020 presidential election, which was both bitter and controversial," Powell's Mot. at 38, and were made "as an attorney-advocate for [Powell's] preferred candidate and in support of her legal and political positions," *id.* at 39. As an initial matter, there is no blanket immunity for statements that are "political" in nature: as the Court of Appeals has put it, the fact that statements were made in a "political 'context' does not indiscriminately immunize every statement contained therein." *Weyrich*, 235 F.3d at 626. It is true that courts recognize the value in some level of "imaginative expression" or "rhetorical hyperbole" in our public debate. *Milkovich*, 497 U.S. at 2.[7] But it is simply not the law that provably false statements cannot be actionable if made in the context of an election.[8]

---

[6] Powell argues that Colorado law applies to Dominion's defamation claim. Powell's Mot. at 22. But because Colorado also uses the *Milkovich* standard to determine whether a statement is actionable, *see NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 9–13 (Colo. 1994), the Court need not reach the choice-of-law question.
[7] Such "imaginative expression" or "rhetorical hyperbole" is permitted under the theory that "the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting); *Snyder v. Phelps*, 562 U.S. 443, 460–61 (2011). But that free trade of ideas depends on a common understanding of the facts, which is undermined by provably untrue statements.
[8] MyPillow appears to similarly argue that the First Amendment grants some kind of blanket protection to statements about "public debate in a public forum." MyPillow's Mot. at 10. Again, there is no such immunity. *See Weyrich*, 235 F.3d at 626. Instead, the First Amendment safeguards our "profound national commitment to the principle that

Powell similarly argues that her statements were protected commentary about other lawsuits. But Powell cannot shield herself from liability for her widely disseminated out-of-court statements by casting them as protected statements about in-court litigation; an attorney's out-of-court statements to the public can be actionable, even if those statements concern contemplated or ongoing litigation. *Messina v. Krakower*, 439 F.3d 755, 761–62 (D.C. Cir. 2006) (recognizing no privilege when statement is "published to persons not having an interest [in] or connection to the litigation") (quoting *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 342 (D.C. 2001)); *see also Williams v. Burns*, 540 F. Supp. 1243, 1247 (D. Colo. 1982) (contemplating actionable defamation claim for attorney's statements while representing client during business transaction).

The question, then, is whether a reasonable juror could conclude that Powell's statements expressed or implied a verifiably false fact about Dominion. *Milkovich*, 497 U.S. at 19–20. This is not a close call. To take one example, Powell has stated publicly that she has "evidence from [the] mouth of the guy who founded [Dominion] admit[ting that] he can change a million votes, no problem at all." Powell Compl. ¶ 181(j). She told audiences that she would "tweet out the video." *Id.* These statements are either true or not; either Powell has a video depicting the founder of Dominion saying he can "change a million votes," or she does not.

To take another example, Powell has stated that she could "hardly wait to put forth all the evidence . . . on Dominion, starting with the fact it was created to produce altered voting results in Venezuela for Hugo Chávez." *Id.* ¶ 181(e). Again, this statement is either true or it is not; either

---

debate on public issues should be uninhibited, robust, and wide-open," *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)) (internal quotation marks omitted), by limiting viable defamation claims to provably false statements made with actual malice.

Dominion was created to produce altered voting results in Venezuela for Hugo Chávez or (as Dominion alleges) it was not.[9]

Take a few more examples. Powell has stated publicly that Dominion "flipped," "weighted," and "injected" votes during the 2020 election, *see supra* at p. 7; Powell Compl. ¶¶ 181(v), 181(ii), 181(u); either Dominion did so or (as Dominion alleges) it did not. Powell has claimed that state officials received kickbacks in exchange for using Dominion machines, *id.* ¶ 181(g); either state officials received such kickbacks or (as Dominion alleges) they did not. All of these statements, and many others alleged in Dominion's Complaint, "expressed or implied a verifiably false fact" about Dominion. *See Weyrich*, 235 F.3d at 624.

Powell argues that these statements are merely her own interpretation of "underlying facts [that] have been disclosed." Powell's Mot. at 32. Statements may not be actionable if the "defendant provides the facts underlying the challenged statements, [and] it is 'clear that the challenged statements represent [her] own interpretation of those facts, . . . leav[ing] the reader free to draw his own conclusions.'" *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11 n.7 (D.D.C. 2019) (quoting *Adelson v. Harris*, 973 F. Supp. 2d 467, 490 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017)). But with respect to many of Powell's allegedly defamatory statements, Dominion alleges (and for the purposes of the Motion to Dismiss, the Court must accept as true) that she lied about having (or at the very least has not disclosed) her purported "underlying facts." For example, Powell has stated that she has "evidence from [the] mouth of the guy who founded [Dominion] admit[ting that] he can change a million votes, no problem at all." Powell Compl. ¶ 181(j). She has not, however, disclosed that video. She has also claimed that Dominion paid "kickbacks and

---

[9] The Venezuela theory presumably finds its roots in the Venezuelan origins of Smartmatic, a different company that Giuliani alleges owns Dominion, *id.* ¶ 101, but that Dominion alleges is its competitor with no connection—either through ownership or software—with Dominion, *id.* ¶ 183.

benefits" to the families of Georgia public officials.  *Id.* ¶ 181(n).  But the only evidence to which

Powell points in support of this claim is an undated (and allegedly doctored) Georgia state

certificate stating that Dominion's systems had "been thoroughly examined and tested and found

to be in compliance with" Georgia law.  *Id.* ¶ 39.  That certificate provides no evidence of illicit

payments to public officials' families; it is certainly not, as Powell has argued,

> evidence . . . from various whistleblowers that are aware of substantial sums of
> money being given to family members of state officials who bought this
> software. . . .  $100 million packages for new voting machines suddenly, in multiple
> states, and benefits ranging from financial benefits for family members to sort of
> what I would call election insurance, because they know that they can win the
> election if they are using that software.

*Id.* ¶ 181(g).  More generally, Dominion alleges that for many of Powell's statements, the evidence

to which she points is either false or provides no factual basis for what she said—and at this stage

in the litigation, the Court must assume the truth of these allegations.  *See Ashcroft v. Iqbal*, 556

U.S. 662, 664 (2009).

     In sum, Dominion has adequately alleged that Powell made a number of statements that

are actionable because a reasonable juror could conclude that they were either statements of fact

or statements of opinion that implied or relied upon facts that are provably false.  *See Milkovich*,

497 U.S. at 20.[10]

---

[10] DTR argues that it did not make any statements about Dominion.  Powell's Mot. at 51.  But Dominion alleges that Powell made her statements (at least in part) as an agent of her law firm and an agent of DTR, and so (at this point in the proceedings) Powell's statements can be imputed to DTR.  Dominion's Mem. in Opp'n to Powell's Mot. to Dismiss ("Powell Opp'n"), ECF No. 39 at 50–51.  In particular, Dominion alleges that Powell acted as an agent of DTR when she solicited donations for it during her defamatory television appearances, Powell Compl. ¶¶ 26, 126, and for her law firm when publishing online the declarations it filed in its election lawsuits, *id.* ¶ 151.  Aside from the agency theory, Dominion also alleges that DTR independently published Powell's statements on its website.  *See, e.g.*, *id.* ¶¶ 52, 58.

### B.  Actual Malice

Powell and Lindell both argue that Dominion has failed to allege that they made their defamatory statements "with 'actual malice,' that is, with 'knowledge that [they were] false or with reckless disregard of whether [they were] false or not.'"  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (quoting *N.Y. Times Co. v. Sullivan*, 370 U.S. 254, 280 (1964)).[11]  A defendant acts in reckless disregard of the truth if she "in fact entertained serious doubts as to the truth of [its] publication" or acted "'with a high degree of awareness of . . .probable falsity.'"  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).  The "'serious doubt' standard requires a showing of subjective doubts by the defendant."  *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987) (en banc); *see also St. Amant*, 390 U.S. at 731 (explaining that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing" the statement); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) ("[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt.").  Subjective doubt can be proven through "the cumulation of circumstantial evidence [and] direct evidence," *id.* at 589 (internal quotation marks and citation omitted), demonstrating that the defendant was "subjectively aware that it was highly probable that [its] story was '(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [it] had obvious reasons to doubt.'"  *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (quoting *Tavoulareas*, 817 F.2d at 790)).

---

[11] For the purposes of the Motions, Dominion does not dispute that it must plead actual malice but argues that it has alleged ample facts to demonstrate that the Defendants acted with the requisite intent.  Powell Opp'n at 23–37; Dominion's Mem. in Opp'n to Lindell's Mot. to Dismiss ("Lindell Opp'n"), ECF No. 47 at 13–34.

### a. Powell

Dominion argues that it has cleared this high bar.  As to Powell, Dominion contends it has alleged not only that Powell's claims are so inherently improbable that only a reckless person could have believed them, but also that she deliberately ignored the truth in favor of relying on facially unreliable sources, intentionally lied about and fabricated evidence to support a preconceived narrative about election fraud, and did so to raise her own public profile and make a profit.

Powell's primary argument is that she could not have "entertained serious doubts as to the truth" or acted with a "high degree of awareness" of the "probable falsity" of her claims because she relied on sworn declarations and other evidence that supported her statements.  Powell's Mot. at 46–48; *see St. Amant*, 390 U.S. at 731.  But there is no rule that a defendant cannot act in reckless disregard of the truth when relying on sworn affidavits—especially sworn affidavits that the defendant had a role in creating.  And Dominion alleges that Powell's "evidence" was either falsified by Powell herself, misrepresented and cherry-picked, or so obviously unreliable that Powell had to have known it was false or had acted with reckless disregard for the truth.  *See, e.g.*, Powell Compl. ¶¶ 91–92, 7.

Powell again faces an obvious hurdle in the fact that she has never produced (nor mentioned in any sworn affidavit) the video of Dominion's founder that she claims to possess, *see supra* at p.6; a reasonable juror could conclude that Powell has not produced the video because she doesn't have it.  Dominion also alleges that Powell doctored a certificate from the Georgia Secretary of State to make it appear as though Georgia officials purchased Dominion machines and software on a rushed timeline.  Powell Compl. ¶ 91.  (The certificate, which is publicly available on the Georgia Secretary of State's website, includes the Georgia Secretary of State's date, seal, and signature—but Powell claimed that the Dominion certification was "undated" and filed a copy of

the certificate that was missing the date, seal, and signature during the course of her election litigation in Georgia.  *Id.*)

Dominion also alleges that Powell had a hand in drafting the declarations she touts as evidence of her claims.  For example, Dominion alleges that the "military intelligence expert" who was the source for one declaration has admitted that he never actually worked in military intelligence, that the declaration Powell's law firm drafted for him was "misleading," and that he was "trying to backtrack" on it.  *Id.* ¶ 5.  Dominion further alleges that after that source's recantation, Powell claimed that the declaration was actually from a *different* anonymous source (instead of investigating whether there was a reason to doubt the truth of the original source's claims).  *Id.*  As for the other anonymous declarations proffered by Powell, Dominion alleges that they bear distinct signs of having been drafted by Powell herself.  Indeed, certain sections in two of the declarations are almost completely identical.  *Id.* ¶ 90.

More generally, Dominion alleges that the declarations provide no facts to support Powell's claims that Dominion flipped, stole, weighted, or injected any votes into a U.S. election.  For example, one declaration says that "vote counting was abruptly stopped in five states using Dominion software"; that at that time "Donald Trump was significantly ahead in the votes"; and that "[w]hen the vote reporting resumed the very next morning there was a very pronounced change in voting in favor of the opposing candidate, Joe Biden."  *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [ECF No. 1-2 at ¶ 26].  The declaration provides no factual support for the proposition that Dominion had flipped votes from Trump to Biden, and it certainly says nothing about Dominion having been created in Venezuela.  Powell Compl. ¶ 181(e).  A second declaration provides even less support; while it mentions *Smartmatic*, it says nothing about

*Dominion* or a U.S. election. *See generally Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [ECF No. 1-3 at ¶ 11].

Dominion further alleges that Powell's "expert" reports are inherently unreliable and, as a former federal prosecutor, Powell had good reason to doubt their veracity. Powell Compl. ¶ 104. In particular, it alleges that one expert was involved in a recent fraud case where the judge "ordered [the 'expert'] to pay more than $25,000 after finding that she violated consumer protection laws by misspending money she raised and soliciting donations while misrepresenting her experience and education," *id.* ¶ 105, and that another was found to have provided "materially false information" in support of his claims of vote manipulation after referencing locations in *Minnesota* when alleging voter fraud in *Michigan*, *id.* ¶ 106. (That expert has also publicly claimed that George Soros, President George H.W. Bush's father, the Muslim Brotherhood, and "leftists" helped form the "Deep State" in Nazi Germany in the 1930s—which would have been a remarkable feat for Soros, who was born in 1930. *Id.*) Dominion also alleges that a third expert has been rejected by another federal court for his "sheer unreliability," *id.* ¶ 107, and a fourth has declared, under penalty of perjury, that there was a pattern of improbable vote reporting in a Michigan county that does not exist, *id.* ¶ 108. According to Dominion, an experienced litigator like Powell either knew (or should have known) about these grave problems with her experts' reliability, and thus she must have "entertained serious doubts as to the truth" of her statements or at a minimum acted "with a high degree of awareness of [their] probable falsity." *Id.* ¶¶ 104–09; *see St. Amant*, 390 U.S. at 731.

Dominion also alleges that Powell cherry-picked and took out of context statements regarding general concerns about election security made by Professor Andrew W. Appel. Powell Compl. ¶ 89. According to Dominion, Professor Appel's research regarding election security is

reputable, but concerns "a decades-old machine *not* designed by Dominion [and] *not* used in the 2020 election in any of the swing states . . . challenged by Powell." *Id.* (emphasis added).  Indeed, Dominion alleges that Professor Appel stated that he "ha[s] never claimed that technical vulnerabilities have actually been exploited to alter the outcome of any US [sic] election" and that "no credible evidence has been put forth that supports a conclusion that the 2020 outcome in any state has been altered through technical compromise." *Id.* (emphasis omitted).  A reasonable juror could conclude that Powell's reliance on Professor Appel's research when he has stated that there is "no credible evidence" of fraud is evidence of at least reckless disregard.  *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 283–84 (D.D.C. 2017).

Dominion argues that its allegations regarding falsified documents, inherently unreliable sources, misrepresentations about other evidence, and Powell's shifting positions reflect actual malice.  It also argues that Powell had reasons for this conduct:  to raise funds, to raise her public profile, and to curry favor with President Trump.  Powell Compl. ¶¶ 75, 80, 185.  Powell argues that Dominion has no facts to support these claims.  But Dominion alleges that Powell repeatedly solicited donations to her law firm and DTR while making her claims, *id.* ¶ 58;[12] that President Trump pardoned her client, Michael Flynn, on the same day she filed her first lawsuit challenging the results of the 2020 election, *id.* ¶ 80; and that in November 2020, "someone purchased the web domain sidneypowellforpresident.com," *id.* ¶ 71.

---

[12] Dominion alleges that Powell leveraged DTR to collect donations under false pretense.  In particular, Dominion alleges that Powell has described DTR as a "non-profit working to help [her] defend all [of her election lawsuits] and to defend [her as an individual]," Powell Compl.¶ 156 (emphasis omitted), and represented that it is a 501(c)(3) and 501(c)(4) organization, *id.* ¶¶ 17–19, but that it appears as neither on the IRS website, *id.* ¶ 20.  And it argues that Powell used DTR donations for personal gain, as indicated by the lack of separation between DTR, Powell, and her law firm:  DTR's and the law firm's websites are connected through at least ten hyperlinks and encouraged users to donate money by checks payable to the law firm's "Defending the Republic Election Integrity Fund," *id.* ¶¶ 175–76, or directly to DTR (but mailed to the law firm's address), *id.* ¶ 177.  According to Dominion, the DTR website began collecting donations before DTR even existed as a corporate entity.  *Id.* ¶ 17.

While it is true that "evidence of ill will 'is insufficient *by itself* to support a finding of actual malice,'" *Tah*, 991 F.3d at 243 (quoting *Tavoulareas*, 817 F.2d at 795 (en banc) (emphasis added)); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989) ("[A defendant's] motive . . . cannot provide a sufficient basis for finding actual malice."), Dominion has proffered much more.  For the reasons discussed, Dominion has adequately alleged that Powell made her claims knowing that they were false, or at least with serious doubts as to their truthfulness.

### b.  Lindell

As for Lindell, Dominion contends that his claims were so inherently improbable that only a reckless man would have made them, that he intentionally disregarded evidence of their falsity, that he relied on obviously unreliable sources, and that he made his claims in accordance with a preconceived narrative that he constructed for financial gain.  Like Powell, Lindell argues that Dominion has failed to allege actual malice because he has "evidence" to support his claims (and because he has never expressed doubt as to their truthfulness).  Lindell's Mot. at 29–41.  But the majority of the evidence to which Lindell points is outside of the Complaint, and the Court cannot rely on this information at this time.  *See Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020) ("In considering claims dismissed pursuant to Rule 12 (b)(6), we accept a plaintiff's factual allegations as true and draw all reasonable inferences in a plaintiff's favor. . . .  [T]he district court erred by relying on two documents outside the complaint."); *Zimmerman*, 246 F. Supp. 3d at 285 (rejecting defendants' attempt to rebut the complaint's allegations of fact and denying defendants' motion to dismiss defamation claim).

Dominion alleges that Lindell has stated, among other things, that Dominion committed the "biggest crime ever committed in election history against our country and the world" and stole

the 2020 election by using an algorithm to flip and weight votes in its machines; that Trump received so many votes that that algorithm broke on election night; that Dominion's voting machines were "built to cheat" and "steal elections"; that a fake spreadsheet with fake IP and MAC addresses was "a cyber footprint from inside the machines" proving that they were hacked; and that Dominion's plot was kept under wraps because the government had not really investigated claims of election fraud (due to then-Attorney General Bill Barr becoming "corrupt" and having been "compromised").  Lindell Compl. ¶¶ 103, 114, 165(e), 165(p), 165(x), 170.  As a preliminary matter, a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it.  *See St. Amant*, 390 U.S. at 732.  But Dominion also alleges other facts that make those claims even more obviously improbable (or at least indicate that a reasonable juror could conclude that those claims are inherently improbable), including (1) public statements by election security specialists, Attorney General Barr, numerous government agencies, and elected officials; (2) independent audits; and (3) paper ballot recounts that disproved those claims.  Lindell Compl. ¶¶ 2, 3, 33–34, 40, 71, 72, 92, 167.  Dominion also alleges that Lindell was made aware of that countervailing evidence in Dominion's retraction letters, *id.* ¶¶ 63, 69, but—instead of reconsidering his claims in light of the mountain of evidence against them—doubled down and "dare[d] Dominion to sue [him]," *id.* ¶ 160.  To be sure, a demand letter that is ignored, without more, does not demonstrate actual malice.  *Chandler v. Berlin*, No. 18-CV-02136 (APM), 2020 WL 5593905, at *4 (D.D.C. Sept. 18, 2020); *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 320 (D.D.C. 2011).  But here, the Complaint rests on much more than Lindell's refusal to retract; it also alleges that Lindell recklessly disregarded the truth by

relying on obviously problematic sources to support a preconceived narrative he had crafted for his own profit.

Moreover, Dominion alleges that the evidence on which Lindell *did* rely contains glaring discrepancies rendering it wholly unreliable.  Lindell, like Powell, relied on the "forensic expert" who had provided "materially false information" in support of his claims of vote manipulation and who had claimed that George Soros, President George H.W. Bush's father, the Muslim Brotherhood, and "leftists" all had a role in forming the Nazi "Deep State" in the 1930s.  Lindell Compl. ¶ 71.  As for the spreadsheet Lindell tweeted as "evidence" that "President Trump got around 79m votes to 68m for Biden," *id.* ¶¶ 75–76, Dominion alleges that the spreadsheet is obviously fake.  In particular, the Complaint alleges that, although the spreadsheet purports to list IP addresses for election hackers and their targets, *id.*, the listed "[t]arget" IP addresses are actually the addresses for the website of a county in a swing state (not for a voting machine or device), *id.* ¶ 81.  And according to Dominion, the MAC addresses in the spreadsheet (which should identify the specific devices involved in the purported hacks) are not even MAC addresses that exist.  *Id.* ¶¶ 83–89.

As for Lindell's purported profit motive, Dominion alleges that Lindell knew that appealing to Trump supporters would be "good for business," *id.* ¶ 22, and that his true motive is apparent in the repeated tying together of his election fraud claims and promotion of MyPillow products.  Like Powell, Lindell correctly notes that allegations of a defendant's ill will or profit motive, without more, do not satisfy the actual malice standard.  *See Harte-Hanks*, 491 U.S. at 666–67.  But again, Dominion has alleged more:  in addition to alleging that Lindell's claims are inherently improbable, that his sources are unreliable, and that he has failed to acknowledge the validity of countervailing evidence, Dominion has alleged numerous instances in which Lindell

told audiences to purchase MyPillow products after making his claims of election fraud and providing MyPillow promotional codes related to those theories.  In totality, it has adequately alleged that Lindell made his claims knowing that they were false or with reckless disregard for the truth.[13]

## C. Deceptive Trade Practices Claims

With respect to Dominion's deceptive trade practices claims, Powell and Lindell argue that Dominion fails to state a claim under the relevant statutes, though for different reasons.

Powell argues that she cannot be liable for deceptive trade practices under Georgia law because Dominion has not alleged that she was "engaged in trade and commerce of goods." Powell's Mot. at 52.  She points to a single case in which the court granted summary judgment to the defendant on a deceptive trade practices claim when the defendant was engaged "neither in the business of selling or distributing the substances at issue, nor in the business of selling or distributing products similar to those sold and distributed by Plaintiffs."  *Int'l Brominated Solvents Ass'n v. Am. Conf. of Governmental Indus. Hygienists, Inc.*, 625 F. Supp. 2d 1310, 1318 (M.D. Ga. 2008).  But the court reached that conclusion only after distinguishing other cases in which the defendant had a "financial interest" in the promulgation of its statements, *id.*; when such an interest exists, there is no requirement that the defendant be engaged in the trade and commerce of goods at issue, *see Davita Inc. v. Nephrology Assocs., P.C.*, 253 F. Supp. 2d 1370, 1380 (S.D. Ga.

---

[13] MyPillow argues that Lindell's statements cannot be imputed to it.  MyPillow's Mot. at 29.  But a corporation may be liable for an executive's conduct when the executive was acting within the scope of his employment and in furtherance of the company's business, *see Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) (determining that a complaint stated a claim for defamation against *The New York Times* where it alleged facts giving rise to a plausible inference that the paper's agents recklessly disregarded the truth); *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 202–04 (D.N.J. 2011) (deciding that a complaint stated a claim for defamation against a corporation where CEO made allegedly defamatory statements).  Here, Dominion alleges that Lindell repeatedly made his statements while being identified as the CEO of MyPillow, Lindell Compl. ¶¶ 51, 70, 96, and at MyPillow-sponsored rallies at which he furthered those claims, *id.* ¶¶ 35, 165, and that MyPillow accepted promotional codes distributed during Lindell's appearances that alluded to those claims (*e.g.*, "FightforTrump"), *id.* ¶ 67.

2003) (permitting a deceptive trade practices claim to proceed when plaintiffs pleaded that defendant made false and misleading comments, statements disparaged plaintiffs' services and business, and maliciousness was ascertainable from complaint).  Dominion, in contrast, has pleaded that Powell had a financial interest in the promulgation of her statements.  *See supra* at 23.

Lindell, in turn, argues that Dominion's deceptive trade practices claim is merely an attempt to avoid the requirements of the First Amendment.  But Dominion has satisfied those requirements, *see supra* at pp. 15 n.7, 24–26, and the Minnesota deceptive trade practices statute expressly contemplates that conduct might be actionable as both a common law tort and under the statute by providing relief "in addition to remedies otherwise available against the same conduct under the common law," Minn. Stat. § 325D.45(3).  And Lindell's argument that only injunctive relief is available under the Minnesota statute, Lindell's Mot. at 38, ignores that Dominion *does* seek injunctive relief, Lindell Compl., Prayer for Relief.

### D.  Personal Jurisdiction

The Powell and Lindell Defendants also move to dismiss the Complaints against them for lack of personal jurisdiction.

A federal court has jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A).  If a District of Columbia court could exercise jurisdiction over the Defendants, then so can this Court.  *Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 98, 105 (D.D.C. 2019) (citing *West v. Holder*, 60 F. Supp. 3d 190, 193 (D.D.C. 2014)).

There are two types of personal jurisdiction:  "[1] general or all-purpose jurisdiction[] and [2] specific or case-linked jurisdiction."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564

U.S. 915, 919 (2011). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Specific jurisdiction, on the other hand, "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Id.* at 127 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). With respect to specific jurisdiction, the Court "must engage in a two-part inquiry: . . . first examine whether jurisdiction is applicable under the [D.C.] long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (citation omitted). The D.C. long-arm statute authorizes specific jurisdiction "over a person, who acts directly or by an agent, as to a claim for relief arising from" certain contacts that person may have with the forum. D.C. Code § 13-423(a).

As relevant here, a defendant's contacts with the District of Columbia can establish specific jurisdiction if the claim arises from the defendant's

(1) transacting any business in the District of Columbia;

. . .

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

*Id.* "When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in [subsection 13-423(a)] may be asserted against him." *Id.* § 13-423(b). A plaintiff bears the burden of establishing personal jurisdictional over each defendant. *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988); *Pinkett v. Dr. Leonard's*

*Healthcare Corp.*, No. 18-1656, 2019 WL 1992904, at *2 (D.D.C. May 6, 2019) ("[T]he requirements for personal jurisdiction 'must be met as to each defendant.'" (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

## 1.  The Powell Defendants

Powell argues that her in-District conduct did not include "business transactions" as contemplated by the D.C. long-arm statute.  Powell's Mot. at 19.[14]  And, she contends, even if her actions constituted business transactions, they were not *with* Dominion, *id.* at 20, directed at D.C. residents, *id.* at 20–21, or related to Dominion's claims for relief, *id.* at 21.

The D.C. long-arm statute certainly covers "business transactions" in the everyday sense of commercial deal-making activities like negotiating or performing contracts.  *See, e.g.*, *Helmer v. Doletskaya*, 393 F.3d 201, 206–07 (D.C. Cir. 2004); *Xie v. Sklover & Co.*, 260 F.Supp.3d 30, 41 (D.D.C. 2017).  But a defendant also transacts business when advertising in the District, *see Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330–32 (D.C. 2000) (en banc), operating an office in the District, *see Wilson v. Wilson*, 785 A.2d 647, 650 (D.C. 2001), representing an out-of-state client before an in-District government entity, *see Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 249 (D.C. 1990) (U.S. Patent and Trademark Office), or traveling to the District for a business purpose when accompanied by "some kind of 'transaction' in the traditional sense," *see IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 112 (D.D.C. 2018).  As alleged by Dominion, Powell has conducted in-District "business transactions":  her representation of Michael Flynn occurred here, and she traveled to and rented hotel rooms here while filming interviews in which she repeated her allegedly defamatory statements.  The long-arm statute does not require that those

---

[14] "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements and thus to merge into a single inquiry."  *GTE New Media Servs. Inc.*, 199 F.3d at 1347 (citing *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)).

business transactions were between Powell and Dominion; it is enough that she has "purposefully engaged in some type of *commercial or business-related activity* directed at District residents," *Trump v. Comm. on Ways & Means*, 415 F. Supp. at 107 (citing *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270–71 (D.C. 2001)), and that there is a "discernible relationship" between her contacts and Dominion's claims, *IMAPizza*, 334 F. Supp. 3d at 112 (quoting *Jackson v. George*, 146 A.3d 405, 412 (D.C. 2016)).[15]

As for the "tortious conduct" prongs of the long-arm statute, Powell argues that none of her allegedly tortious conduct resulted in Dominion suffering an injury here.  Powell's Mot. at 21–22.  But Dominion alleges that it suffered reputational injury in the District when Powell spoke here, including at the Republican National Committee press conference, Powell Compl. ¶ 62, and in television appearances filmed at the Trump International Hotel, *id.* ¶ 24.  It is certainly reasonable to infer that there is a reason Powell regularly traveled *here* to make those statements: This District is where elected officials—some of whom have influence over decisions about elections and government contracts—conduct their business, and it is where Powell could avail herself of audiences with President Trump and the Trump campaign.  Dominion—a voting machine provider—certainly has an interest in maintaining its reputation with the federal government and the state governments that might be influenced by federal employees, and it has alleged that Powell caused injury to that reputation when she spoke to audiences here.[16]

---

[15] Because Powell's in-District conduct was also in her capacity as an agent for her law firm and DTR, her District contacts can be imputed to those Defendants and the personal jurisdictional analysis is the same.  D.C. Code § 13-423(a)(4) (authorizing jurisdiction over a person, who acts directly *or by an agent*) (emphasis added).  In any event, DTR and Powell's law firm had their own contacts that constitute "transacting business" in this District:  both employed at least two employees here, both held out office locations here, Powell's law firm engaged in the representation of Michael Flynn, and law firm attorneys listed a D.C. address on their court filings.

[16] Personal jurisdiction under §13-423(a)(3) is proper under the Due Process Clause when, as here, the defendant is physically within the District when she took the alleged action.  *Wormley v. United States*, 601 F. Supp. 2d 27, 33 (D.D.C. 2009).

### 2.   The Lindell Defendants

Lindell, like Powell, argues that he neither "transacted business" nor tortiously caused injury within this District.  Lindell's Mot. at 47–49.  But Dominion alleges that that he traveled to the District to appear at three MyPillow-sponsored rallies, Lindell Compl. ¶¶ 51, 52, 55, 57, 165(a)–(b), 165(k), and touted his relationship with President Trump to market his products here (for example, during the 2017 White House event in which Trump endorsed MyPillow and at an August 2020 speech in the Rose Garden, *id.* ¶¶ 22, 23).

Lindell argues that these contacts are insufficient because any conduct underlying a tort claim cannot count as "transact[ing] business" for purposes of the D.C. long-arm statute.  Lindell's Mot. at 47.  But Lindell misconstrues the law:  while tortious conduct by a nonresident *outside* the District does not constitute "transacting . . . business in the District," *IMAPizza*, 334 F. Supp. 3d at 112, a person's in-District conduct can qualify as both tortious and "transacting business."

Lindell's argument that Dominion could not have suffered injury in this District, Lindell's Mot. at 47–48, fares no better than Powell's.  Dominion alleges that it suffered reputational injury here as a result of Lindell's in-District conduct, and again, there is a reason Lindell regularly traveled *here* to appear at rallies and make his claims:  This District is where Lindell could target influential D.C. audiences, including public officials and institutions with significant roles in public discourse about elections, and where Dominion alleges it suffered injury to its reputation.[17]

---

[17] Just as Powell's contacts can be imputed to DTR and her law firm, Lindell's contacts can be imputed to MyPillow. D.C. Code § 13-423(a)(4) (authorizing jurisdiction over a person, who acts directly *or by an agent*) (emphasis added). And MyPillow clearly transacted business within this District by sponsoring several rallies at which Lindell made at least three allegedly defamatory appearances.

## V.     Venue

Powell and Lindell's final argument is that their cases should be dismissed for improper venue or, in the alternative, transferred to their home districts (for Powell, the Northern District of Texas; for Lindell, the District of Minnesota).

### A.  Legal Standard

"Courts in this circuit must examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993).  Venue is proper in the district where (1) any defendant resides, if all defendants reside in the same state; (2) "a substantial part" of the events giving rise to the suit occurred; or (3) if venue would not be proper in any district for those reasons, wherever the defendants are subject to personal jurisdiction.  28 U.S.C. § 1391(b).

In considering a motion to dismiss for improper venue, the Court must "accept[] the plaintiff's well-pled factual allegations regarding venue as true, draw[] all reasonable inferences from those allegations in the plaintiff's favor, and resolve[] any factual conflicts in the plaintiff's favor." *Pendleton v. Mukasey*, 552 F. Supp. 2d 14, 17 (D.D.C. 2008) (quoting *Darby v. U.S. Dep't of Energy*, 231 F. Supp. 2d 274, 276–77 (D.D.C. 2002)).  The plaintiff bears the burden of establishing that venue is proper.  *Freeman v. Fallin*, 254 F. Supp. 2d 52, 56 (D.D.C. 2003).  But even when venue is proper, a defendant may move to transfer the case "to any other district . . . where it might have been brought" "[f]or the convenience of the parties and witnesses" and "in the interest of justice."  28 U.S.C. § 1404(a).  That decision is within the Court's discretion and requires "an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612,

622 (1964)).  "The moving party bears the initial burden of establishing that transfer is proper."

*Mandan, Hidatsa, & Arikara Nation v. U.S. Dep't of Interior*, 358 F. Supp. 3d. 1, 6 (D.D.C. 2019).

## B.  Analysis

Powell and Lindell both argue that venue is improper because "a substantial part" of the events giving rise to the suits did not occur in this district, presumably under a theory that *more* of the alleged statements occurred while they were outside of the District.  But on a motion to dismiss for improper venue, the question is not "which district is the 'best' venue" or which "has the most significant connection"; it is "whether the district the plaintiff chose had a substantial connection to the claim."  *Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3d 1, 11 (D.D.C. 2019) (quoting *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 96 (D.D.C. 2012)).  And Dominion has easily alleged in-District conduct comprising "a substantial part" of the events giving rise to its claims: this is where Powell made numerous in-person and televised appearances in which she voiced her claims to D.C. audiences, where she rented hotel rooms and represented Michael Flynn, and where Lindell touted his relationship with President Trump and spoke at several in-person rallies.  Venue in this district is proper.

### 1.  Transfer to the Northern District of Texas

To demonstrate that the case against her should be transferred to the Northern District of Texas, Powell must establish by a preponderance of the evidence that (1) Dominion could properly have filed the case in that court and (2) "considerations of convenience and the interest of justice weigh in favor of transfer."  *Brannen v. Nat'l R.R. Passenger Corp.*, 403 F. Supp. 2d 89, 92 (D.D.C. 2005).  Dominion does not dispute that it could have filed the suit in Texas.  After all, Powell is domiciled there.[18]  Dominion instead focuses its arguments on whether considerations of

---

[18] Powell's law firm is registered in Texas and DTR is a Texas corporation.  Powell Compl. ¶¶ 16, 21.

34

convenience and justice support transfer.  The Court first considers six private interest factors: "(1) the plaintiff's choice of forum; (2) the [defendants'] choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof."  *Id.* at 92–93.  It then turns to three public interest factors:   "(1) the transferee [court's] familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home."  *Id.* at 95.

Powell correctly notes that, although the plaintiff's choice of forum is usually granted substantial weight, it is given less deference when the plaintiff chooses a foreign forum.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981).  But even a plaintiff's choice of a foreign forum is entitled to some weight when there is a nexus between that forum and the events giving rise to the plaintiff's claims.  *See Wilderness Soc. v. Babbitt*, 104 F. Supp. 2d 10, 13 (D.D.C. 2000).  Again, there is such a nexus here:  this is where Powell traveled to meet with President Trump and the Trump campaign, represented Michael Flynn, and spoke to in-person and television audiences.

As for Powell's choice of forum, her preference for transfer to Texas is understandable.  That is where she lives, where her law firm is registered, and where DTR is incorporated.  Her preference is entitled to some weight.

The next factor—where the claims arose—presents a different challenge.  It is difficult to pinpoint a single location where the claims against Powell arose.  Powell's in-District conduct certainly gave rise to a portion of Dominion's claims, but Powell's out-of-District conduct is also relevant; she made statements that Dominion challenges here on several occasions (and not always within the District) and filed her election suits in other states.  Ultimately, however, Powell does

not provide the Court with any conduct *in Texas* that gave rise to Dominion's claims, and so she fails to demonstrate that transfer to that district is warranted on that basis.

The Court next turns to which district is more convenient to the Parties and witnesses, and which has easier access to sources of proof. It is presumably more convenient for Powell to litigate the case in her home district, but this concern is somewhat mitigated by the fact that Powell has demonstrated the ease with which she can travel—and engage in litigation—here. She has routinely traveled here and engaged in legal representation for clients in this district. Indeed, her law firm has an office here. As for Dominion, it is located in Colorado and Canada, Powell Compl. ¶¶ 12, 13, and it is not clear that the Northern District of Texas is any more convenient than this district. Regarding witnesses and evidence, Powell is a witness located in Texas, as is Russell Ramsland (one of Powell's experts). Powell's Mot. at 28. But again, it is clear that Powell can easily travel to this courthouse, and other witnesses and evidence are located here: this is where Powell spoke at the Republican National Committee press conference, where government and campaign officials live and work, where some of Powell's television interviews were taped, and where Powell's attorneys represented Michael Flynn. This factor weighs against transfer.

As for the relevant public interest considerations, the Northern District of Texas is no more familiar with the governing laws in this case and Powell has not pointed to any related actions in her preferred forum. There are, of course, related actions in *this* forum (Dominion's suits against Giuliani and Lindell). The congestion of the relevant court calendars does not weigh in either direction; while the median time between filing and trial is faster in the Northern District of Texas, the median time from filing to disposition is faster here.[19] As for the district's local interest in

---

[19]    United States District Courts – National Judicial Caseload Profile, U.S. Courts, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf (last visited Aug. 2, 2021).

deciding local controversies at home, Powell has not proffered any "local interest" in the Northern District of Texas. But there is certainly such an interest in this district, where several of the events underlying Dominion's claims occurred. *See Stewart v. Azar*, 308 F. Supp. 3d 239, 249 (D.D.C. 2018).

Powell has failed to demonstrate that private or public interests counsel in favor of transfer to the Northern District of Texas; she has certainly not done so by a preponderance of the evidence. The Court therefore declines to transfer the case against her.

### 2.   Transfer to the District of Minnesota

Like Powell, Lindell argues that the case against him should be transferred to his home district. The Court therefore conducts a similar inquiry with respect to that case and the interests of Minnesota.

Dominion does not dispute that it could have sued Lindell in Minnesota; but it argues that considerations of convenience and justice do not support transfer.[20]

Dominion's choice of forum is entitled to some weight because there is a nexus between the District and the events giving rise to Dominion's claims: this is where Lindell appeared at White House events and rallies. But Lindell's choice of forum (in the place where he and MyPillow are domiciled) is likewise entitled to some weight.

The next factor—where the claims arose—provides little guidance. As a preliminary matter, Lindell equates the state whose law applies to the claim with the place where that claim arose. But Dominion's claim arose where the claim accrued, not necessarily in the state whose law applies. *See, e.g.*, *Ctr. for Envtl. Science, Accuracy & Reliability v. Nat'l Park Serv.*, 75 F.

---

[20] As the Plaintiffs in the cases are identical, some of the analysis is the same as that already conducted for Powell's Motion. The Court therefore limits its discussion to the ways in which the inquiries differ.

Supp. 3d 353, 357–58 (D.D.C. 2014) (determining that the claim arose where challenged activity occurred).  And Dominion has alleged that Lindell and MyPillow acted in this district by sponsoring rallies and making defamatory statements here.  It is true that some of the relevant decisions might have taken place in Minnesota; that is presumably where MyPillow executives made decisions about sponsoring rallies and from where they issued MyPillow ads.  But neither Lindell nor MyPillow points to specific statements or decisions made in Minnesota.

The remaining private factors (convenience to the Parties and witnesses and ease of access to sources of proof) do not point strongly in any direction, although they might slightly support transfer.  None of the Parties is based in this district, and some MyPillow witnesses are presumably located in Minnesota.  But evidence is located in both districts:  evidence regarding MyPillow decision-making will be based in Minnesota, while evidence relating to statements and conduct in the District of Columbia will be located here.

As for the relevant public interest considerations, while the District of Minnesota is more familiar with the state law underlying Dominion's deceptive trade practices claim, *see Brannen*, 403 F. Supp. 2d at 95, Lindell has failed to show that it will be any more familiar with the law regarding the defamation claim because (according to Lindell) that claim will largely turn on constitutional questions and either federal court is competent to decide the relevant federal issues, *see Preservation Soc. of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 57 (D.D.C. 2012).  Lindell urges the Court to conclude that MyPillow's own lawsuit (filed after the case against him here) counsels in favor of transfer, but that ignores the first-filed rule, *see Holland v. ACL Transp. Servs., LLC*, 815 F. Supp. 2d 46, 55 (D.D.C. 2011) (denying motion to transfer, in part because "the longstanding first-filed rule militates against transfer, as the first of these two cases was filed here"), and the other two related lawsuits already before this Court.  The congestion

of the relevant court calendars does not weigh in either direction; while the median time between filing and trial is faster in the District of Minnesota, the median time from filing to disposition is faster here.[21]   And as for the local interest in deciding local controversies at home, Minnesota's interest in deciding controversies regarding the Lindell Defendants is outweighed by this district's interest in controversies arising from events that occurred here.  *See Stewart*, 308 F. Supp. at 249.

Lindell has thus failed to demonstrate by a preponderance of the evidence that transfer is warranted, and the Court declines to transfer the case against him.[22]

## VI.    Giuliani's Rule 9 Motion

For his part, Giuliani moves to dismiss the Complaint against him on very different grounds.  *See generally* Giuliani's Mem. Supp. Defs.' Mot. to Dismiss ("Giuliani's Mot."), ECF No. 26-2.  His Motion has three parts:  first, that Dominion is a corporation and therefore may only recover lost profits; second, that lost profits are special damages subject to Rule 9(g)'s heightened pleading requirements (which Dominion has failed to satisfy); and third, that each individual corporate entity must plead its own damages amount (instead of pleading damages as a group).

### A.  Individualized Pleading

It is easiest to start with Giuliani's third argument, which goes to the Court's subject matter jurisdiction.  Giuliani argues that Dominion's Complaint should be dismissed under Rule 12(b)(1) because the three corporate Plaintiffs have failed to plead distinct legal injuries that are unique to each Plaintiff and therefore fail to establish Article III standing.[23]

---

[21]    United   States   District   Courts   –   National   Judicial   Caseload   Profile,   U.S.   Courts, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf   (last   visited   Aug.   2, 2021).

[22] Lindell and MyPillow also argue that they are entitled to attorneys' fees under the D.C. Anti-SLAPP Act. MyPillow's Mot. at 26–27; Lindell's Mot. at 58.  But the special motion to dismiss provision of that statute does not apply in federal court.  *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1334, 1337 (D.C. Cir. 2015); *Tah*, 991 F.3d at 239 (confirming that *Abbas* remains circuit law).

[23] Giuliani also asserts that the Court does not have prudential standing under a "single business enterprise" theory of recovery.  Giuliani's Mot. at 8–10.  But Dominion does not assert such a theory; instead, it pleads that each Plaintiff

For a plaintiff to establish standing under Article III, it must show (among other things) that it has suffered an "injury in fact" that is concrete and particularized. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A "particularized" injury is one that affects the plaintiff in a personal and individual way. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). In cases premised on the court's diversity jurisdiction, the plaintiff must also satisfy the statute's (1) complete diversity and (2) amount in controversy (more than $75,000) requirements. 28 U.S.C. § 1332. Giuliani does not seriously dispute that the Plaintiffs have alleged an injury in fact; nor does he argue that they have failed to allege complete diversity; nor does he contend that they have failed to plead over $75,000 in damages. Instead, Giuliani argues that *each* Plaintiff must plead that it suffered more than $75,000 in damages and that all Plaintiffs have failed to do so because the Complaint alleges damages amounts only with respect to "Dominion" (which, for purposes of the Complaint, collectively refers to all three corporate Plaintiffs).

With respect to suits brought under §1332, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted). For the Court to reject Dominion's alleged damages, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* at 289.

Affording to Dominion reasonable inferences from its factual allegations, *see Settles*, 429 F.3d at 1106, the Complaint alleges that each corporate entity was independently exposed to "hatred and contempt," Giuliani Compl. ¶ 184, and suffered injuries in the form of stalked and harassed employees, death threats, expenses "to remedy the defamation and to protect the lives of

corporation has suffered damages as a result of Giuliani's alleged defamation to the tune of "not less than $651,735,000." Giuliani Compl., Prayer for Relief.

its employees," lost profits, and damage to reputation, *id.* ¶ 185. And again drawing reasonable inferences in Plaintiffs' favor, *see Settles*, 429 F.3d at 1106, each corporate entity has pleaded injuries exceeding $75,000.

At the very least, Plaintiffs allege a total of $651,735,000 in damages, which obviously means that at least one Plaintiff allegedly suffered more than $75,000 in damages. Giuliani Compl., Prayer for Relief. Thus, even if two of the Dominion Plaintiffs had *not* individually pleaded that they meet the amount-in-controversy requirement, the Court could exercise supplemental jurisdiction over their claims. *See Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 549 (2005) ("[W]here the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction.").

## B. Lost Profits

Giuliani also argues that Dominion is required to (and has not) pleaded lost profits with the specificity required by Federal Rule of Civil Procedure 9(g).

This argument rests on the premise that Dominion is required to plead damages for its defamation claim. Under D.C. law, defamation may be actionable as a matter of law irrespective of actual harm ("defamation *per se*") or, if not, when the plaintiff pleads special harm. *Franklin v. Pepco Holdings, Inc. (PHI)*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012).[24] There is no question that

---

[24] Giuliani argues that Dominion has pleaded that D.C. law applies to its defamation claim. A better reading of the Complaint is that Dominion alleges punitive damages may be available under D.C. law. In any event, the choice-of-law issue is irrelevant at this stage in the proceedings because New York and Colorado law—the two other sources of law potentially applicable—also permit recovery when a statement is *per se* defamatory or when the plaintiff has pleaded special harm. *Sharratt v. Hickey*, 20 A.D.3d 734, 735(Ny. App. Div. 2005) ("Plaintiffs in a defamation action must prove special damages, meaning economic or financial loss, unless they fit within an exception in which damages

Giuliani's statements accusing Dominion of election fraud constitute defamation *per se*; if Dominion were an individual, damages would be presumed.  *See Grossman v. Goemans*, 631 F. Supp. 972, 974 (D.D.C. 1986) (noting that false allegations of criminal conduct is actionable without proof of special damages).

But Giuliani contends that damages are not presumed for *corporate* plaintiffs in the defamation *per se* context.  For this proposition, he relies on three cases.  The first is *Martin-Marietta Corp. v. Evening Star Newspaper*, 417 F. Supp. 947 (D.D.C. 1976), in which a corporate plaintiff had sued for libel (but not libel *per se*) and the court contemplated the standard of fault that should apply.  In particular, Giuliani points to *Martin-Marietta*'s explanation that

> [t]he law of libel has long reflected the distinction between corporate and human plaintiffs by limiting corporate recovery to actual damages in the form of lost profits.  As stated by a court in this district, "Although a corporation may maintain an action for libel, it has no personal reputation and may be libeled only by imputation about its financial soundness or business ethics."

*Id.* at 955 (quoting *Golden Palace, Inc. v. Nat'l Broadcasting Co.*, 386 F. Supp. 107, 109 (D.D.C. 1974)).  While *Martin-Marietta* certainly stated in *dicta* that a corporate plaintiff is limited to actual damages in the defamation context, it did not address whether (let alone hold that) such a plaintiff must plead damages if it has alleged defamation *per se*.  The other two cases on which Giuliani relies are Court of Appeals opinions citing *Martin-Marietta*, which similarly do not address whether (let alone hold that) a corporate plaintiff must plead actual damages if it has alleged defamation *per se*.  Instead, those cases stand, at most, for the proposition that a corporate plaintiff's recovery is measured in the form of economic loss (which is usually lost profits).  As the Court of Appeals put it:

---

are presumed, i.e., defamation per se."); *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004) ("If a libelous communication is defamatory per se, damage is presumed, and a plaintiff need not plead special damages.").

> Corporations are very different [from flesh-and-blood humans].  To be sure, corporations may derive substantial financial value from their brands' reputations. But that is precisely the point:  reputation is an asset that companies cultivate, manage, and monetize.  It is not a quality integral to a company's emotional well-being, and its diminution exacts no psychological cost.  This is why, for example, "[t]he law of libel has long reflected the distinction between corporate and human plaintiffs by limiting corporate recovery to actual damages in the form of lost profits."

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 461–62 (D.C. Cir. 2018) (quoting *Martin-Marietta*, 417 F. Supp. at 955).

The Court is not aware of any case requiring a corporate plaintiff alleging defamation *per se* to plead damages specially, and by its terms Rule 9(g) does not include such a requirement.  In any event, Dominion has pleaded lost profits with the particularity required by Rule 9(g).  Under that rule, a defamation plaintiff must set "forth the precise nature of [its] losses as well as the way in which the special damages resulted from the allegedly false publication." *Schoen v. Wash. Post*, 246 F.2d 670, 672 (D.C. Cir. 1957).  Here, Dominion alleges that Giuliani made defamatory statements about its involvement in the 2020 election, that the people who believed those statements made threats to Dominion employees and board members, and that those threats required Dominion to spend more than $565,000 on private security to protect its employees. Giuliani Compl. ¶ 126.  Although Giuliani contends that Dominion may satisfy Rule 9(g) *only* by "identifying either particular customers whose business has been lost or facts showing an established business and the amount of sales before and after the disparaging publication, along with evidence of causation," *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002), the cases he cites merely provide examples of how a plaintiff may specifically state pecuniary harm and demonstrate that those harms resulted from defendant's conduct.  In its Complaint against Giuliani, Dominion alleges that it suffered economic harm in the form of additional expenses that it would not have incurred if not for Giuliani's alleged defamation, as well as the loss of future contracts.

*See also* Giuliani Compl. ¶¶ 128 (noting that Dominion has incurred $1,170,000 in expenses to mitigate harm to reputation and business); *id.* ¶ 135 (projecting lost profits of $200 million over the next five years when reduced to present value).[25]  Dominion has also alleged how those losses resulted from Giuliani's defamatory statements. *Id.* ¶¶ 106–32.   The Complaint therefore alleges lost profits with adequate specificity and survives Giuliani's Motion to Dismiss.

## VII.   Conclusion

For the foregoing reasons, the Court denies Defendants' Motions to Dismiss in full.  An Order will be entered contemporaneously with this Memorandum Opinion.


DATE:  August 11, 2021

CARL J. NICHOLS
United States District Judge

---

[25] At this stage in the proceedings, it is reasonable to infer that Dominion's lost future contracts include those in states that currently contract with Dominion.  *See* Giuliani Compl. ¶ 135 ("[T]he elected officials who are Dominion's actual and potential customers have received emails, letters, and calls from their constituents demanding that they avoid contracting with Dominion or using Dominion machines.  As a result, elected officials, insurers, and potential investors have been deterred from dealing with Dominion, putting Dominion's contracts in more than two dozen states and hundreds of counties and municipalities in jeopardy and significantly hampering Dominion's ability to win new contracts.").

44